## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Mark B. Dargis, being duly sworn and appointed as a Special Agent of the Federal Bureau of Investigation, hereby make the following statement, based on information obtained by myself, other Special Agents of the Federal Bureau of Investigation, the U.S. Department of Health and Human Services Office of Inspector General, the U.S. Office of Personnel Management Office of Inspector General, and Detectives of the District of Columbia Metropolitan Police Department.

1. This Affidavit is made in support of a search and seizure warrant for the vehicle described as a **model year 2003 Lincoln four-door sedan bearing Vehicle Identification Number (VIN) XXXXXXXXXXXXXXXXX.** The vehicle to be searched is further described in Attachment A of this Affidavit. The evidence, fruits, and instrumentalities of criminal activity believed to be located within the vehicle are set forth in Attachment B of this Affidavit.

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since 2003, assigned to the Washington Field Office in the District of Columbia. In that time I have been assigned to a white collar crime unit, investigating health care fraud matters in the District of Columbia and surrounding areas, to include the diversion of prescription narcotic drugs and the commission of related drug crimes by those who illegally obtain and sell prescription narcotic drugs. Since 2003, I have received training and experience in the enforcement of the laws of the United States, interviewing and interrogation

1

techniques, arrest procedures, search warrant applications, search and seizure, white collar crimes, health care fraud, prescription drug diversion and associated fraud in the field of pain management, and various other crimes.  In July, 2005, I attended specialized training conducted by the National Health Care Anti-Fraud Association focusing on the areas of prescription drug diversion and pain management fraud.  In the overall course of my training and experience, I have become familiar with the methods and techniques associated with the diversion of prescription narcotic drugs, the distribution of illicit narcotics and other controlled substances, the laundering of drug sale proceeds, and the organization of criminal drug conspiracies.  In the course of conducting my investigations of health care fraud, prescription drug diversion, and pain management fraud since 2003, I have either been involved in the use of, or coordinated the planning and execution of, the following investigative techniques: research of public records and databases, physical surveillance, electronic surveillance including consensual monitoring and recording of conversations, data analysis, the use of confidential informants and cooperative witnesses, undercover operations, and search warrant operations.

3.     The facts and information contained in this Affidavit are based upon my personal knowledge of this investigation, and also the information conveyed to me by other Special Agents of the FBI, the Department of Health and Human Services Office of Inspector General (HHS-OIG), the Office of Personnel Management Office of Inspector General (OPM-OIG), and Detectives of the District of Columbia Metropolitan Police Department (MPD) who are involved in this investigation.  The information in this Affidavit does not include each and every fact known to the Government, rather it only includes the information necessary to prove that probable cause exists for a search warrant to be issued for the below identified and described

location, for evidence of violations of Title 21, United States Code, Section 841(a) (Distribution of a Controlled Substance).

## CONDUCT OF INVESTIGATION

4.  On or about April 20, 2006, a Cooperative Witness (hereinafter CW #1) who is currently being prosecuted in another jurisdiction voluntarily contacted the FBI and reported that an individual known to him/her as MELVIN GALE (hereinafter "GALE") is a significant trafficker of diverted prescription drugs in Washington, D.C.  CW #1 was subsequently interviewed by Special Agents of the FBI regarding the information he/she claimed to possess, and the Agents in turn provided a summarized verbal report to your Affiant.

5.  On or about April 25, 2006, Special Agents of the FBI drove in a vehicle with CW #1 to an area of Washington, D.C., where CW #1 claimed to have knowledge of GALE's current residence.  CW #1 subsequently identified the residence at 46 Burns Street Northeast, Washington, D.C. as that of GALE.

6.  On April 26, 2006, a Special Agent of the FBI conducted research of publically available databases via computer and the Internet, using the identification details provided by CW #1, and confirmed that the residence located at XX XXXXX XXXXXX Northeast, Washington, D.C. is the most current residence of record for MELVIN GALE.  This research also produced GALE'S date of birth and social security account number.  The above described results were printed in hardcopy form and reviewed by your Affiant.

7.  The same Internet search results described in Paragraph 6 also identify a current motor vehicle registered to GALE as a 2003 Lincoln Town Car Executive - Sedan 4 Door, with VIN XXXXXXXXXXXXXXXXX, and District of Columbia license plate XXXXXX.

8.   On May 4, 2006, CW #1 was interviewed by your Affiant and related detailed information regarding GALE'S sources for obtaining the diverted prescription drugs and his methods for selling them.

9.   On or about May 6, 2006, your Affiant conferred with Special Agent Christopher Gleason of OPM-OIG, who reported that an individual named MELVIN GALE is currently a registered beneficiary of the Federal Employee Health Benefit Plan (FEHBP), a health insurance program administered by the U.S. Government for federal employees, including those employees of the Government of the District of Columbia.  Special Agent Gleason further reported that GALE'S wife, THERESA ALSTON GALE, is also a FEHBP beneficiary, registered as a dependent of GALE.  Special Agent Gleason confirmed that the date of birth, social security account number, and home address for GALE in the FEHBP records system were identical to the information obtained previously by Special Agents of the FBI via Internet research.

10.   FEHBP health insurance claim data shows that GALE regularly receives monthly prescription refills in his name for a variety of controlled substances.  The most commonly received are: Oxycontin (Oxycodone) 40 milligrams, quantity 180 pills, Oxycontin (Oxycodone) 80 milligrams, quantity 30 pills, Percocet (Oxycodone with Acetaminophen) 7.5/325 milligrams, quantity 120 pills, and Methadone 10 milligrams, quantity 120 pills.  GALE has been receiving prescription refills through the FEHBP every month since June, 2003.

11.   FEHBP health insurance claim data shows that THERESA ALSTON GALE regularly receives monthly prescription refills in her name for a variety of controlled substances.  The most commonly received are: Oxycontin (Oxycodone) 40 milligrams, quantity180 pills, Percocet (Oxycodone with Acetaminophen) 7.5/325 milligrams, quantity 120 pills, and Methadone 10

milligrams, quantity 120 pills. THERESA ALSTON GALE has been receiving presccription refills through the FEHBP every month since April, 2003.

12.     According to the Controlled Substances Act of 1970 (21 U.S.C. § 801 et seq.), further enhanced by the Schedules of Controlled Substances found at 21 C.F.R. § 1308 et seq., Oxycodone, Oxycodone with Acetaminophen, and Methadone are all Schedule II controlled substances.

13.     On June 18, 2006, at the direction of the FBI, CW #1 contacted GALE telephonically and arranged to meet him on June 19, 2006, with the intention of purchasing diverted prescription drugs from GALE. This call was monitored and recorded by Special Agents of the FBI.

14.     On June 19, 2006, CW #1 arrived at the location of a pre-arranged meeting with GALE in northeast Washington, D.C., and was subsequently directed via cellular telephone by GALE to follow GALE'S vehicle. GALE eventually led CW #1 to the vicinity of Brooks Street Northeast and 44th Street Northeast, Washington, D.C., and parked directly adjacent to Smothers Elementary School located at XXXX XXXXXX XXXXXX Northeast. CW #1 exited his/her vehicle and entered the passenger side of GALE'S vehicle, whereupon CW #1 exchanged $2300 in FBI-provided funds for 100 pills of Oxycontin 40 milligrams and 120 pills of Percocet 7.5/325 milligrams provided by GALE. The entire meeting was recorded for both audio and video by Special Agents of the FBI using technical equipment worn by CW #1.

15.     Additionally, during the conduct of the June 19, 2006, controlled drug purchase operation, physical surveillance of CW #1 was maintained by Special Agents of the FBI, HHS-OIG, and OPM-OIG, who monitored the meeting in real-time via a radio transmitter worn by CW #1. The vehicle in which CW #1 and GALE were observed together was a gold-colored

5

Lincoln four-door sedan.

16.     At the conclusion of the meeting with GALE on June 19, 2006, CW #1 met with Special Agents of the FBI, who seized the Oxycontin and Percocet pills, contained in two separate unlabeled plastic bottles, as evidence. CW #1 was subsequently debriefed and reported that GALE instructed him/her to rip the pharmacy labels off of one of the bottles before departing. GALE ripped the pharmacy label off of the other bottle. CW #1 further reported that he/she observed the last name GALE on the label that he/she removed.

17.     On June 26, 2006, at the direction of the FBI, CW #1 contacted GALE telephonically and arranged to meet him on June 27, 2006 with the intention of purchasing diverted prescription drugs from GALE. This call was monitored and recorded by Special Agents of the FBI.

18.     On June 27, 2006, CW #1 attended a pre-arranged meeting with GALE at GALE'S residence located at XX XXXXX XXXXXX Northeast, Washington, D.C. During the course of the meeting, CW #1 exchanged $3000 in FBI-provided funds for 90 pills of Oxycontin 40 milligrams and 30 pills of generic Oxycodone 80 milligrams provided by GALE. The entire meeting was recorded for both audio and video by Special Agents of the FBI using technical equipment worn by CW #1.

19.     Additionally, during the conduct of the June 27, 2006, controlled drug purchase operation, physical surveillance of CW #1 was maintained by Special Agents of the FBI, HHS-OIG, and OPM-OIG, who monitored the meeting in real-time via a radio transmitter worn by CW #1. During the surveillance operation, a gold-colored Lincoln four-door sedan with D.C. license plate XXXXXX was observed parked on the street, curbside in front of GALE'S residence.

20. At the conclusion of the meeting with GALE on June 27, 2006, CW #1 met with Special Agents of the FBI, who seized the Oxycodone and Oxycontin pills, contained in two separate unlabeled plastic bottles, as evidence.  CW #1 was subsequently debriefed and reported that GALE instructed him/her to rip the pharmacy labels off of the bottles before leaving the residence.  CW #1 further reported that he/she observed the patient name MELVIN GALE on one label and THERESA ALSTON on the other label.

21. On June 28, 2006, at the direction of the FBI, CW #1 contacted GALE telephonically and arranged to meet him on June 29, 2006 with the intention of again purchasing diverted prescription drugs from GALE.  This call was monitored and recorded by Special Agents of the FBI.

22. On June 29, 2006, CW #1 attended a pre-arranged meeting with GALE at GALE'S residence located at 46 Burns Street Northeast, Washington, D.C.  During the course of the meeting, CW #1 exchanged $4000 in FBI-provided funds for 200 pills of generic Oxycodone 40 milligrams provided by GALE.  Although CW #1 was wearing technical equipment provided by the FBI for the purpose of recording the meeting with GALE, it was discovered afterwards that the equipment malfunctioned and no recording was obtained.

23. However, during the conduct of the June 19, 2006, controlled drug purchase operation, physical surveillance of CW #1 was maintained by Special Agents of the FBI, HHS-OIG, and OPM-OIG, who monitored the meeting in real-time via a radio transmitter worn by CW #1. During the surveillance operation, GALE was observed entering a gold-colored Lincoln four-door sedan with D.C. license plate XXXXXX which was parked on the street, curbside across from GALE'S residence. The vehicle, driven by GALE, subsequently departed the area.

24. At the conclusion of the meeting with GALE on June 29, 2006, CW #1 met with Special Agents of the FBI, who seized the Oxycodone pills, which were contained in an unlabeled plastic bottle, as evidence. CW #1 was subsequently debriefed and reported that GALE instructed him/her to rip the pharmacy label off of the bottle before leaving the residence. CW #1 further reported that he/she observed the patient name MELVIN GALE on the label.

**PROBABLE CAUSE FOR SEARCH OF A
2003 LINCOLN FOUR-DOOR SEDAN BEARING
VEHICLE IDENTIFICATION NUMBER (VIN) 1LNHM81WX3Y703843.**

25. A review of driver's license data made available by the District of Columbia to law enforcement officers engaged in the conduct of a legitimate criminal investigation shows that the residential property located at XX XXXXX XXXXXX Northeast, Washington, D.C. is listed as the legal address of MELVIN GALE.

26. A review of publically available databases via computer and the Internet, using information gathered in the course of the above described criminal investigation identified a current motor vehicle registered to GALE as a 2003 Lincoln Town Car Executive - Sedan 4 Door, with VIN XXXXXXXXXXXXXXXXX, and District of Columbia license plate XXXXXX.

27. Surveillance conducted by your Affiant of the residence at 46 Burns Street Northeast, Washington, D.C. on June 27, 2006, during the conduct of a controlled purchase of diverted prescription drugs by CW #1, revealed a gold colored Lincoln four-door sedan with District of Columbia license plate XXXXXXX parked on the street in front of the residence. According to vehicle registration information obtained via the National Crime Information Center (NCIC), that vehicles is registered to MELVIN GALE.

28.     Surveillance conducted by your Affiant of the residence at 46 Burns Street Northeast, Washington, D.C. on June 29, 2006, during the conduct of a controlled purchase of diverted prescription drugs by CW #1, resulted in photographs taken of GALE and CW #1 departing the residence concurrently.  Immediately afterwards, GALE was observed entering a gold colored Lincoln four-door sedan with District of Columbia license plate XXXXXXX parked on the street across from his residence and departing the area.

29.     A review of NCIC criminal history records for MELVIN GALE, FBI number 799324D, revealed a prior criminal arrest of GALE in Washington, D.C. on January 1, 1995, for violation of the Controlled Substances Act, specifically possession of cocaine with intent to distribute, while armed.  Additionally, the NCIC report shows GALE has an extensive past history of arrests and convictions for felonies such as extortion, robbery, assault with a deadly weapon, kidnaping, and attempted murder.

30.     Based on my experience in the investigation of prescription drug diversion and associated drug crimes, and based on information relayed to me by other law enforcement officers assigned to investigate prescription drug diversion and narcotics crimes, I know that persons involved in the diversion of prescription drugs, and the selling and distribution of other illegal drugs, often keep evidence of their criminal activity in their vehicles, especially if those vehicles are used as meeting locations to conduct drug sales transactions.  This evidence often includes the drugs being diverted and/or sold, prescription records, financial records, financial instruments to include sums of cash, drug paraphernalia, ledgers and notes of customers and drug sales transactions, photographs of known and unknown co-conspirators, correspondence with or related to other co-conspirators, and firearms.

## **CONCLUSION**

31. For the reasons stated herein, your Affiant has probable cause to believe that within the vehicle described as a **model year 2003 Lincoln four-door sedan bearing Vehicle Identification Number (VIN) XXXXXXXXXXXXXXXXX**, as described in Attachment A, there are presently items specified in Attachment B which constitute fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Section 841(a) (Distribution of a Controlled Substance). Your Affiant respectfully requests a United States District Court for the District of Columbia issue a search warrant for the entire vehicle described as a model year 2003 Lincoln four-door sedan bearing Vehicle Identification Number (VIN) XXXXXXXXXXXXXXXXX, fully described in Attachment A, for the search and seizure of items listed in Attachment B of this Affidavit.

      I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

                                              Mark Dargis, Special Agent
                                              Federal Bureau of Investigation

Sworn to and subscribed before me on this _____ day of July, 2006.

                                              United States Magistrate Judge
                                              District of Columbia

## ATTACHMENT A

<u>Description of the vehicle to be searched.</u>

The vehicle is described as a model year 2003 Lincoln four-door Town Car sedan, gold in color, bearing Vehicle Identification Number (VIN) 1LNHM81WX3Y703843, with District of Columbia license plate CG2711.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Based on the facts as are recited in the attached Affidavit, your Affiant has probable cause to believe the following items are located at the above premises, and contain evidence of the crimes described in the affidavit.

The terms "records," "documents," and "materials" include all of the foregoing items of evidence in whatever form and by whatever means such records, documents or materials, their drafts, or their modifications may have been created and stored, including, but not limited to, any handmade form (such as writing or drawing with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (such as printed pages or typed pages), and any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives or electronic notebook, as well as printouts or readouts from any magnetic storage device)..

Items subject to search and seizure are as follows:

1.      Any and all prescription medications found within the residence, in the name of MELVIN GALE, THERESA ALSTON, THERESA GALE, THERESA ALSTON GALE, and any heretofore unknown others.  These prescription medications can include, but are not limited to, Methadone, Oxycontin, Oxycodone, Oxycodone with Acetaminophen, and Percocet.

2.      Any and all illicit drugs as set forth and described under 21 U.S.C. § 801,et seq.,

to include, but not limited to, cocaine powder, cocaine base (crack cocaine), cannabis (marijuana), and heroin.

3. Any and all records, documents, and materials related to the act of obtaining prescription medications, to include, but not limited to: health insurance benefits cards, health insurance "Explanation of Benefits" documents, prescription forms and pads (either blank or completed with prescribing orders from a physician), pharmacy labels, pharmacy receipts, invoices from wholesale prescription medication providers, and similar records.

4. Any and all statements and records of accounts maintained at financial institutions, money drafts, money orders, ATM receipts, credit/debit card transaction receipts, letters of credit, cashiers' checks, safe deposit keys, statements of accounts, return and/or canceled checks, checkbooks and stubs, duplicate and copies of checks, deposit items, savings passbooks, loan documents and similar bank and financial accounts or other financial records.

5. United States currency, and other financial instruments of value, and other indicia of proceeds of criminal activity.

6. Any and all notes, ledgers, markings, documents, papers, folders, photographs, paper scraps, and partial documents relating to the conduct of drug sales transactions.

7. Any and all notes, ledgers, markings, documents, papers, folders, photographs, paper scraps, and partial documents relating to correspondence with or about co-conspirators in a drug distribution enterprise.

8. Firearms, including but not limited to handguns, rifles, long guns, shotguns, ammunition, holsters, or any other objects related to firearms, including, but not limited to, registration records.

<u>Computer-related items subject to search and seizure are as follows:</u>

To effectuate the search and to the extent necessary to retrieve documents identified in the affidavit which may be stored electronically, the following items will be seized as needed:

9. <u>Hardware</u>

Computer hardware consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

10. <u>Documentation</u>

Computer-related documentation consisting of written, recorded, printed or electronically stored material which explains or illustrates how to configure or use the computer hardware, software or other related items.

11. <u>Software</u>

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics or spreadsheet programs), utilities, compilers, interpreters and communication programs.

12.     <u>Passwords and Date Security Devices</u>

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make inaccessible or unusable, as well as reverse the process to restore it.